UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,                    No. 14-cr-20670

vs.                                    Hon. Gerald E. Rosen

ALFREDO JIMENEZ-ROBLES,

                Defendant.
_____/

OPINION AND ORDER REGARDING
DEFENDANT'S MOTION TO SUPPRESS

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on April 13, 2015

PRESENT:  Honorable Gerald E. Rosen
                    United States District Chief Judge

## I.  INTRODUCTION

Defendant Alfredo Jimenez-Robles, a Mexican citizen, is charged in a one-count Information with Unlawful Re-entry after having been previously excluded, deported and removed from the United States, in violation of 8 U.S.C. § 1326(a). On December 19, 2014, through counsel, Jimenez-Robles filed the instant "Motion to Suppress Statements and for an Evidentiary Hearing."  In this motion, Defendant challenges statements made to a Boarder Patrol Agent on October 10, 2014 claiming that the statements must be suppressed because he was not read his *Miranda* rights before he made them.  The

1

Government responded to Defendant's motion.  On February 4, 2015, the Court

conducted an evidentiary hearing on the matter, at which it heard the testimony of United

States Border Patrol Agent Christopher Cole.  At the conclusion of the hearing, the Court

ordered supplemental briefing, and took the matter under advisement.  The parties have

complied with the Court's order and supplemental briefs have been filed by both the

Government and Defendant.

Having now had the opportunity to review and consider the parties' briefs, the

arguments of counsel, the testimony and the evidence submitted at the hearing held on

February 4, 2015, and the Court's entire record of this matter, the Court is now prepared

to rule on Defendant's Motion.  This Opinion and Order sets forth the Court's ruling.

## II.  PERTINENT FACTS[1]

Alfredo Jimenez-Robles entered the United States illegally somewhere near

Laredo, Texas in late April or May 2014.  Jimenez-Robles had previously illegally

entered the United States several times, and after several arrests by the U.S. Border Patrol

-- most of which resulted in Jimenez-Robles simply being allowed to voluntarily return to

Mexico -- on April 16, 2014, he was formally removed through the Laredo, Texas Port of

---

[1]  The facts presented in this Opinion are gleaned from the reports of Task Force
Agent Timothy Yobak [Government Response Ex. 1], Border Patrol Agent Christopher
Cole [Government Ex. 2], BPA Cole's Affidavit in support of the Criminal Complaint in
this matter [No. 14-mj-30519], and Cole's testimony at the February 4, 2015 evidentiary
hearing.  Although TFA Yobak did not testify, on the record at the February 4 hearing,
the Government stipulated to the accuracy of TFA Yobak's report.

Entry.[2]  However, six months later, on October 10, 2014, he was found in Michigan by agents of the Combined Hotel Interdiction Enforcement (CHIEF) Task Force who at the time were engaged in an ongoing investigation of drug and bulk smuggling in Southeast Michigan.  Jimenez-Robles was taken into custody after he was stopped by Task Force Agents on I-94 in Jackson County for having committed several traffic violations.

During the course of their CHIEF Task Force investigation, agents apparently became interested in the activities of Jimenez-Robles based on a tip from a confidential informant.  On October 9, 2014, Task Force Agent Tim Yobak learned from personnel at a certain Motel 6 in the Detroit area that Defendant was registered at the motel and had

---

[2]  According to the Affidavit of Border Patrol Agent Christopher Cole given in support of his Criminal Complaint in this matter [No. 14-mj-30519, Dkt. # 1], Jimenez-Robles entered the United States illegally on May 26, 1998, January 4, 2001, January 9, 2001, and twice on February 14, 2001, each time being allowed to voluntarily return to Mexico, and after each such voluntary return, Jimenez-Robles again illegally re-entered the U.S.  On April 17, 2001 he was ordered removed in absentia (having failed to appear for his immigration hearing date as specified).  He was finally apprehended in January 2009 and on February 13, 2009, he was physically removed to Mexico through the El Paso, Texas Port of Entry.  He thereafter again illegally re-entered the country and was subsequently arrested for tampering with a government license, seal, certificate or permit, and then was presented to the Violent Criminal Alien Section for prosecution of 8 U.S.C. § 1326.  Prosecution was denied.  On December 6, 2010, Jimenez-Robles was physically removed through the Laredo, Texas Port of Entry.  He once again illegally re-entered the country and was arrested in San Antonio, Texas for driving without a license.  On March 6, 2011, Jimenez-Robles was once again presented for prosecution for 8 U.S.C. § 1326 and on August 25, 2011 he was convicted, and subsequently served 173 days incarceration.  Thereafter, Jimenez-Robles was physically removed through Laredo, Texas and was barred from returning to the U.S. for 20 years.  However, on October 8, 2013, he was again found in the United States.  He was convicted of 8 U.S.C. § 1325 and served 180 days in jail.  Thereafter, he was formally removed through Laredo, Texas on April 16, 2014.

paid for a one-night stay with cash.  Intelligence checks were conducted which revealed that Jimenez-Robles had previously been deported no fewer than four times and that on October 9, 2014 he was also deportable.

Surveillance of the Defendant was established the morning of October 9, 2014.  At approximately 1:40 p.m. on that date, Defendant was observed as he exited the motel and got into a 2013 gold-colored Hyundai.  Task Force agents followed as Jimenez-Robles drove directly to the MGM Grand Casino parking garage in Detroit and entered the casino, where he stayed and played craps for an extended period of time.  He was observed returning to his car several times, each time seen entering the car and reaching toward the glove compartment upon entry, apparently to obtain more currency to continue gambling.

At approximately 10:15 a.m. the next day, October 10, 2014, Jimenez-Robles finally left the casino, got back into his car, and drove to I-96 and Outer Drive.  He slept in his car at that location for several hours, then at approximately 2:15 p.m., he departed that spot and proceeded west on I-96 to I-94, then continued west on I-94 until approximately 3:00 p.m., when he was stopped by TFA Yobak near Exit 130 in Parma, Michigan "because of several improper lane changes and improper lane use."  [Yobak report, Government Ex. 1.]  When questioned about Yobak's reason for traffic stop, Border Patrol Agent Christopher Cole, who is also a member of the CHIEF Task Force, testified that "Agent Yobak does not have authority to pull somebody over for

4

immigration violation." [2/14/15 Hearing Tr., p. 11.]

After effecting the stop of Defendant's vehicle, TFA Yobak made contact with Defendant and positively identified him as Jimenez-Robles. [Yobak report, p. 3.] According to Yobak, Defendant verbally consented to a search of his car. *Id.* TFA Dave Toler handcuffed Defendant and Defendant's car was then driven to a safer location at the freeway exit for the search. *Id.* Defendant was kept out of the car during the search.[3] BPA Cole was then called to the scene. The Government admitted at the hearing that Cole was called to the scene because of the possibility, if not the probability, that Jimenez-Robles was again in the country illegally. [*See* 2/4/15 Hrg. Tr., p. 7.] Cole testified that he arrived approximately ten minutes after he was called.

BPA Cole, who had just been assigned to the CHIEF Task Force a few months earlier, in June or July 2014, testified that all of the Task Force members involved in the investigation of the Defendant had been briefed several hours before Jimenez-Robles was stopped as to Defendant's activities and the data base checks that indicated Jimenez-Robles might be in the United States illegally. Cole specifically testified that he had been told well prior to arriving on the scene of the stop that Defendant had been previously

---

[3] The search of the car was conducted without incident; no narcotics or currency were found. Task Force Agents did, however, observe a picture of Jesús Malverde attached to the interior rear view mirror. According to TFA Yobak's report, Jesús Malverde is known to law enforcement officers as the "narco saint," and his picture is a symbol of narcotics traffickers. A K-9 sniff was also conducted. Although the K-9 did alert on the interior of the vehicle, no contraband was found.

deported.

Cole further  testified that there were as many as eight agents involved at the high point of the stop, and that when he arrived on the scene, the other agents asked him to watch Jimenez-Robles while they searched his car.  Accordingly, Cole took custody of Defendant while the search was conducted, and proceeded to question Defendant.

Like the other agents on the scene, BPA Cole was in plain clothes when he arrived, wearing his Border Patrol badge around his neck.  Cole stated that he did not recall Jimenez-Robles being in handcuffs when he arrived, and that no weapons were drawn.

Cole testified that before he arrived at the scene, he already had reason to believe that Jimenez-Robles might be in the country illegally and that his interaction with the Defendant was specifically designed to determine Defendant's identity and his immigration status.  Cole further testified that he knew that if Jimenez-Robles made statements that indicated he was in the country illegally, such statements could give rise to criminal charges for violation of the immigration laws.

According to BPA Cole, in response to questions he asked Jimenez-Robles while the car was being searched, Jimenez-Robles told him that he was in the area visiting family, but he could not recall where his family lived.  He then stated that he was visiting friends, but he could not recall where his friends lived.  Cole asked Defendant if he was a U.S. Citizen to which Jimenez-Robles responded, "I'm working at it."  Cole then asked

6

Defendant, "So, are you here legally right now?", to which Jimenez-Robles responded,

"No, I'm illegal."  Cole then placed Jimenez-Robles under arrest, secured an immigration

detainer, and transported him to the Gibralter, Michigan Border Patrol Station for further

processing.

      According to BPA Cole, while Jimenez-Robles was being transported to the

Gibralter Station, he stated to Cole, "Another Christmas in jail.  That's ok, I'll be back."

Cole asked him, "You are going to come back? Even if the judge deports you?", to which

Defendant answered, "Fuck, yes! I have my family here." Cole then asked, "How much

does it cost to get smuggled back?", to which Defendant responded, "About $3,000.00."

Cole then asked him, "Do you have that kind of money?", to which Defendant replied,

"No, but a guy, when I was in jail, told me how to make money really easy, and you guys

will never catch me!"  BPA Cole asked, "How?", to which Defendant merely reiterated,

"You guys will never catch me."[4]

      It was not until 9:00 p.m., the evening of  Thursday, October 10, 2014, after

arriving at the Gibralter Border Patrol Station, that Jimenez-Robles was read his *Miranda*

rights, in English, by Supervisory BPA James Hudecki in the presence of BPA Cole.

After being informed of his rights, Jimenez-Robles indicated he was willing to answer

questions and did not wish to speak with a lawyer.  He was also notified of his right to

---

[4]  The Government has stipulated that it will not seek to use the statements
Jimenez-Robles made while being transported to the Border Patrol Station in its case-in-
chief.  Therefore, these statements are not at issue in this Motion.

speak to the Mexican Consulate, which he also declined.

Defendant was administratively processed for reinstatement of his previous deportation, and he was remanded to the custody of the U.S. Marshals. On Monday, October 14, 2014, BPA Cole filed a criminal complaint charging Jimenez-Robles with illegal re-entry into the United States. The U.S. Attorney subsequently authorized prosecution, and on October 22, 2014, charged him in an Information with Unlawful Re-entry after Prior Removal, in violation of 8 U.S.C. § 1326.

On December 19, 2014, Defendant filed the instant Motion to Suppress.

As an initial matter the Court notes, as indicated above, that the statements Jimenez-Robles made to BPA Cole in the car while being transported to the Gibralter Border Patrol Station are not at issue here because the Government has stipulated that it will not use these statements in its case-in-chief. Nor is Defendant challenging the biographical and identity responses made to the agents who pulled him over or statements he made related to the search of the car. The only statements that are at issue here are the statements Defendant made to BPA Cole in response to questions posed to him on the side of the road at the site of the traffic stop concerning his citizenship and immigration status.

## III.   DISCUSSION

### THE REQUIREMENT OF A "CUSTODIAL INTERROGATION"

The Fifth Amendment of the United States Constitution provides that "no person

... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend V. To ensure that criminal defendants are accorded this Fifth Amendment right, in *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that a suspect subject to a custodial interrogation must first be given notice of his right against self-incrimination. *Id.* at 478-79. Statements elicited in noncompliance with this rule generally may not be admitted into evidence in a criminal trial. *Id.* at 479; *Stansbury v. California*, 511 U.S. 318, 322, 114 S.Ct. 1526, 1528 (1994); *Dickerson v. United States*, 530 U.S. 428, 435 120 S.Ct. 2324, 2331 (2000). The Fifth Amendment protection afforded by the *Miranda* rule applies to citizens and aliens alike. "Even one whose presence in this country is unlawful, involuntary, or transitory is entitled to that constitutional protection." *Matthews v. Diaz*, 426 U.S. 67, 77, 96 S.Ct. 1883 (1976).

However, as indicated above, the *Miranda* safeguards apply only to "custodial interrogations." That phrase has two components: the "in custody" requirement, *see, e.g., Stansbury v. California*, *supra,* 511 U.S. at 322, and the "interrogation" requirement, *see, e.g., Rhode Island v. Innis*, *supra,* 446 U.S. 291, 300-301, 100 S.Ct. 1682 (1980).

<u>What Constitutes an "Interrogation" for *Miranda* Purposes</u>

To determine whether law enforcement questioning constitutes "interrogation" for purposes of *Miranda*, the court asks whether the law enforcement officer questioning the defendant knew or reasonably should have known that the questions asked were reasonably likely to elicit an incriminating response. *Rhode Island v. Innis, supra*, 446

U.S. at 301-302, 100 S.Ct. at 1689.

Although courts have held that, generally, questioning a defendant about biographical information is insufficient to trigger the *Miranda* rule, *see United States v. Clark*, 982 F.2d 965, 968 (6th Cir. 1993); *United States v. Avery*, 717 F.2d 1020, 1024 (6th Cir. 1983), *cert. denied*, 466 U.S. 405 (1989); *United States v. Ozuna*, 170 F.3d 654, 657 n. 1 (6th Cir. 1999), here, Defendant's foreign citizenship and immigration status are core elements of the crime with which he is charged.  Under these circumstances, where the officer who questioned the defendant "was reasonably aware of who he was interviewing [and] his citizenship, . . . obtaining basic pedigree information. . . was not just obtaining necessary background information but was likely to provide the primary evidence supporting a violation" of the immigration laws, since in an immigration case, "questions pertaining to place of birth go beyond basic pedigree information and go to the heart of the crime itself." *United States v. Toribio-Toribio*, 2009 WL 2426015 at *2 (N.D.N.Y. Aug. 6, 2009); *see also United States v.Sepulveda-Sandoval*, 729 F. Supp. 2d 1078, 1099, 1101 (D.S.D. 2010) (questions as to whether defendant was in the country legally were not routine booking questions but rather constituted interrogation requiring *Miranda* warnings where defendant faced a charge of being a non-immigrant alien in possession of a firearm in violation of 18 U.S.C. § 922(g)(5)(A), and any response could incriminate defendant and possibly lead to additional charges); *United States v. Arroyo-Garcia*, 2014 WL 1309078 at * 8 (N.D. Ga. Mar. 31, 2014) (*Miranda* warnings required

10

where "questions about whether [defendant] was in the country illegally and whether he had any documentation allowing him to be here legally went beyond merely determining alienage, and predictably elicited incriminating responses based on the facts known to the agents at the outset of the interview.")

Likewise, the requirements of *Miranda* cannot be avoided simply by labeling immigration inquiries as "civil" or "administrative." *United States v. Mellado-Evanguelista*, 2009 WL 161240 at *4 (D. Minn. Jan. 22, 2009); *United States v. Mata-Abundiz*, 717 F.2d 1277, 1279-80 (9th Cir. 1983) ("[T]he investigator cannot control the constitutional question by placing a "civil" label on the investigation."). As the court noted in *Mellado-Evanguelista*, "The key inquiry . . . on which this Court must focus, is whether the immigration officer conducting an interview for administrative purposes knows or should know that the questions asked would elicit incriminating responses." *Id.* "Where the questioning of a suspect's alienage goes to an element of a crime charged and the investigator has reason to believe that evidence of alienage could lead to federal criminal prosecution, failure to give *Miranda* warnings makes statements regarding alienage inadmissible." *United States v. Urrieta*, 2007 WL 208526, at * 10 (M.D. Tenn. Jan. 24, 2007), *rev'd on other grounds*, 520 F.3d 569 (6th Cir. 2008); *United States v. Guerrero-Acosta*, 152 F.3d 930, 1998 WL 416482 at *1 (9th Cir.), *cert. denied*, 525 U.S. 954 (1998) (citing  *United States v. Mata-Abundiz*, 717 F.2d 1277, 1280 (9th Cir.1993)) ("In-custody questioning by I.N.S. investigators is equivalent to an interrogation and

11

must be preceded by *Miranda* warnings if the questioning is reasonably likely to elicit an incriminating response.... Questions regarding citizenship [in an I.N.S. investigation] are very likely to produce such a response."). *See also United States v. Toribio-Toribio*, *supra*; *United States v. Adoni-Peña*, 2009 WL 3568488 (D. Vt. Oct. 23, 2009) (though agent was primarily concerned with administrative deportation, if the agent had reason to believe the defendant's citizenship and immigration status could give rise to criminal charges, he should have known of the potentially incriminatory nature of the disclosures sought; hence, *Miranda* warnings were required).

In this case, in its pre-hearing brief in response to Defendant's Motion and at the hearing on this matter, the Government's principal argument was that BPA Cole's questioning of Defendant was done for "administrative" immigration purposes; therefore, it did not constitute a custodial "interrogation" and, hence, *Miranda* warnings were not required.  However, the Government now concedes that Cole's questions did amount to "interrogation" for *Miranda* purposes, because, in light of the information that had been provided to BPA Cole about Jimenez-Robles's prior deportation, Cole should have known that the questions he put to Jimenez-Robles -- whether he was a U.S. citizen and whether he was in the country legally -- were reasonably likely to elicit an incriminating response.  [*See* Government's Supplemental Brief, p. 17.]

Nevertheless, the Government argues that the statements should not be suppressed because Jimenez-Robles was not "in custody" when he made the unwarned statements to

12

BPA Cole.

_Miranda_'s "In Custody" Requirement

As indicated above, "[t]he requirements of _Miranda_ arise only when a defendant is both in custody and being interrogated." _United States v. Head_, 407 F.3d 925, 928 (8th Cir. 2005); _United States v. Swanson_, 341 F.3d 524, 528 (6th Cir. 2003) (quoting _Oregon v. Mathiason_, 429 U.S. 492, 495, 97 S. Ct. 711, 714, 50 L. Ed. 2d 714 (1977)) (An interrogating officer's "obligation to administer a _Miranda_ warning arises 'only where there has been such a restriction on a person's freedom as to render him 'in custody'.'" _Id._)

The question of whether a defendant was "in custody" is a mixed question of fact and law, _United States v. Swanson, supra_, that turns on whether there has been either "'a formal arrest or restraint on freedom of movement of the degree associated with formal arrest.'" _Id._ (quoting _United States v. Knox_, 839 F.2d 285, 291 (6th Cir. 1988), _cert. denied_, 490 U.S. 1019 (1989) (quoting _California v. Beheler_, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L. Ed. 2d 1275 (1983))).  Generally, in the absence of a formal arrest, in determining whether the defendant was in custody, the court must decide whether a reasonable person would have felt "at liberty to terminate the interrogation and leave." _Thompson v. Keohane_, 516 U.S. 99, 112, 116 S.Ct. 457, 133 L. Ed. 2d 383 (1995).  This requires an examination of the totality of the circumstances.  _United States v. Swanson, supra; United States v. Salvo_, 133 F.3d 943, 948 (6th. Cir.), _cert. denied_, 523

U.S. 1122 (1998) ( the court is to look to the totality of the circumstances "to determine how a reasonable man in the suspect's position would have understood the situation." *Id.* (citation omitted)).

In *Swanson*, the Sixth Circuit enumerated a number of factors that courts should consider in making this determination, the first factor being "whether a reasonable person in the defendant's position would feel free to leave." 341 F.3d at 529. The court noted that "in the context of a *Terry*-style investigatory detention, a person is not free to leave, at least temporarily." 341 F.3d at 529. Thus, the court found that this first factor "weighs in favor of defining [defendant's] detention and questioning as a custodial interrogation." *Id.* However, as this is but one factor to be considered, the *Swanson* court then went on to consider several other factors, including:

> (1) the purpose of the questioning; (2) whether the place of the questioning was hostile or coercive; (3) the length of the questioning; and (4) other indicia of custody such as whether the suspect was informed at the time that the questioning was voluntary or that the suspect was free to leave or to request the officers to do so; whether the suspect possessed unrestrained freedom of movement during questioning; and whether the suspect initiated contact with the police ... [or] acquiesced to their requests to answer some questions.

*Id.* (quoting *United States v. Crossley*, 224 F.3d 847, 861 (6th Cir. 2000) (quoting *Salvo*, 133 F.3d at 950).

Although in *Swanson*, the court ultimately concluded that there had not been such a restriction on the defendant's freedom to render him "in custody" for *Miranda* purposes in that case, both the Supreme Court and the Sixth Circuit have repeatedly instructed that

courts are to take into account the totality of the circumstances in each case. "'[T]he circumstances of each case must certainly influence a determination of whether a suspect is 'in custody' for purposes of receiving *Miranda* protection.'" *United States v. Knox*, *supra,* 839 F.2d at 291 (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)).

Before applying the *Salvo/Swanson* "reasonable person" inquiry factors, the Court will first address the Government's argument that this was merely a *Terry*-style traffic stop and detention and, as a consequence, Defendant was not as a matter of law entitled to full custody *Miranda* rights.

The court acknowledges that in *Berkemer v. McCarty*, the Supreme Court held that motorists subjected to garden-variety traffic stops are not entitled to *Miranda* warnings. 468 U.S. at 440, 104 S.Ct. at 3150. In reaching this determination, the Court applied the standard *Miranda* inquiry, and concluded that "the atmosphere surrounding an ordinary traffic stop is substantially less 'police-dominated' than that surrounding the kinds of interrogation at issue in *Miranda* itself. . . ." *Id*. at 439, 104 S.Ct. at 3149-50. It noted that when compared to formal interrogations, ordinary traffic stops are "comparatively nonthreatening" and "noncoercive" in character. *Id*. at 440, 104 S.Ct. at 3150.

The *Berkemer* Court also recognized, however, that when a given traffic stop becomes more coercive than a routine traffic stop, police may well be required to advise a suspect of his *Miranda* rights even though the underlying seizure of the individual might

15

qualify as a reasonable investigative detention under the Fourth Amendment. *See id.* ("If a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by *Miranda*."). In drawing a distinction between an ordinary traffic stop and those detentions where coercion is present, the Supreme Court implicitly, if not explicitly, appreciated a critical fact:  Although some detentions not rising to the level of a formal arrest may be reasonable within the meaning of the Fourth Amendment, *e.g.,* the so-called "*Terry* stop,"  those same detentions may nonetheless create the custodial situation in which *Miranda* was designed to operate.

In *Berkemer*, the Supreme Court described the typical traffic stop and police questioning in that context as "presumptively temporary and brief" and not "police dominated" to show how it did not amount to "custodial interrogation" for *Miranda* purposes:

> Two features of an ordinary traffic stop mitigate the danger that a person questioned will be induced "to speak where he would not otherwise do so freely."  First, detention of a motorist pursuant to a traffic stop is presumptively temporary and brief.  The vast majority of roadside detentions last only a few minutes. A motorist's expectations, when he sees a policeman's light flashing behind him, are that he will be obliged to spend a short period of time answering questions and waiting while the officer checks his license and registration, that he may then be given a citation, but that in the end he most likely will be allowed to continue on his way. . . .
>
> Second, circumstances associated with the typical traffic stop are not such that the motorist feels completely at the mercy of the police. To be sure, the aura of authority surrounding an armed, uniformed officer and the

16

knowledge that the officer has some discretion in deciding whether to issue a citation, in combination, exert some pressure on the detainee to respond to questions. But other aspects of the situation substantially offset these forces. Perhaps most importantly, the typical traffic stop is public, at least to some degree. Passersby, on foot or in other cars, witness the interaction of officer and motorist. This exposure to public view both reduces the ability of an unscrupulous policeman to use illegitimate means to elicit self-incriminating statements and diminishes the motorist's fear that, if he does not cooperate, he will be subjected to abuse. The fact that the detained motorist typically is confronted by only one or at most two policemen further mutes his sense of vulnerability. In short, the atmosphere surrounding an ordinary traffic stop is substantially less "police dominated" than that surrounding the kinds of interrogation at issue in *Miranda*.

468 U.S. at 437-39, 104 S.Ct. at 3149-50 (citations omitted).

The record evidence in this case establishes that Defendant Jimenez-Robles's questioning did not take place during an "ordinary" traffic stop, as described by the *Berkemer* Court. Here, Defendant's detention lasted far longer than a "few minutes."[5]

_____

    [5] According to his report, TFA Yobak effected the traffic stop of Defendant at 1500 hours, i.e., 3:00 p.m. BPA Cole stated that he arrived on the scene approximately ten minutes after he was informed that Jimenez-Robles had been pulled over. [*See* Tr. p. 12.] He testified that he "maintained custody" over Defendant while the search of his vehicle was conducted. It is clear from the record evidence in this case that the search lasted more than a few minutes -- the car was moved from the stop location, a drug canine unit was called, and after the canine unit arrived, a drug sniff was conducted. According to BPA Cole's report, he transported Defendant to the Gibraltar, Michigan Border Patrol Station, and after arrival, Defendant was read his *Miranda* rights at 9:00 p.m. -- i.e., *six hours* after he was pulled over by TFA Yobak. The Court takes notice that it generally takes approximately 1 ½ hours to drive from Parma, Michigan to Gibralter, Michigan, the location of the Gibralter Border Patrol Station to which Defendant was transported. *See* Google Maps, driving directions at www.google.com/maps/dir/Parma,+MI/Gibraltar,+MI/@42.1078718,-84.4854418,9z/dat a=!3m1!4b1!4m13!4m12!1m5!1m1!1s0x883d380581a7df6d:0xa1ca9274dddeea3c!2m2! 1d-84.5996885!2d42.2583711!1m5!1m1!1s0x883b3ede066d866b:0x980f835f4bfa8b3!2 m2!1d-83.1896484!2d42.0950426. Even accounting for the travel time from the site of the traffic stop to Gibraltar, it would appear that Defendant was detained at the side of the

Indeed, even in *Berkemer*, the Court contrasted the ordinary traffic stop described above to that of the motorist in *Commonwealth v. Meyer*, 488 Pa. 297, 412 A.2d 517 (1980), who, as a result of his detention at the side of the road for over a half-hour, part of the time in a patrol car, was determined to be "in custody" for purposes of *Miranda*, *see Berkemer*, 468 U.S. at 441, n. 34, 104 S.Ct. at 3151 n. 34, and to the motorist in *United States v. Schultz*, 442 F. Supp. 176, 180 (D. Md. 1977), who was pulled over by police for erratic driving and then subjected to persistent questioning along side and in the squad car about drinking alcohol and smoking marihuana, and denied permission to contact his mother, was held to have been in custody for the purposes of *Miranda* by the time he confessed to possession of a sawed-off shotgun. *Berkemer*, 468 U.S. at 442, n. 36, 104 S.Ct. at 3151, n. 36. Suffice it to say that what constitutes "in custody," even in the context of a *Terry*-type traffic stop, must be determined "on a case-by-case basis." *United States v. Schultz*, 442 F. Supp. at 181.

Turning then to the instant case, if this were an "ordinary" traffic stop, after verifying his identification and issuing him a citation for the traffic violation, Defendant Jimenez-Robles would have been allowed to continue on his way. *Berkemer, supra*. But Defendant here was not allowed to leave. Furthermore, this was not a one-officer and one motorist encounter. What started out as a one- or two-officer stop escalated during the course of Defendant's detention. BPA Cole testified that at the high point of

---

road at the traffic stop site for several hours.

the stop, as many as eight agents were involved.  As the Supreme Court made clear in
*Berkemer,* if an individual who has been detained pursuant to a traffic stop thereafter is
subjected to treatment that renders him in custody for practical purposes, he is entitled to
the full panoply of protections prescribed by *Miranda.* 468 U.S. at 440, 104 S.Ct. at
3150.

The Court will, therefore, turn to the factors identified by the court in *Swanson* to
determine whether, notwithstanding the traffic-stop nature of the origination of Jimenez-
Robles's roadside detention, he was "in custody" when he was questioned by BPA Cole
and, therefore, entitled to the protection afforded him under the Fifth Amendment.  As
indicated above, the factors to be considered include (1) whether a reasonable person in
the defendant's position would have felt free to leave; (2) the purpose of the law
enforcement questioning; (3) whether the place of the questioning was hostile or
coercive; (4) the length of the questioning; and (5) other indicia of custody such as (a)
whether the defendant was informed at the time that the questioning was voluntary or that
the suspect was free to leave; (b) whether the defendant possessed unrestrained freedom
of movement during questioning; (c) and whether the defendant initiated contact with the
police or acquiesced to their requests to answer questions.  *Swanson*, 341 F.3d at 529
(some enumeration altered and added).

First, it is clear from the record evidence and testimony that a reasonable person in
Defendant Jimenez-Robles's position would not have felt free to leave the site.  BPA

19

Cole stated several times during the evidentiary hearing that Defendant was, in fact, *not* free to leave:

| | |
|---|---|
| THE COURT: | Was Mr. Jimenez-Robles free to go at any time [after] you arrived and began questioning him? |
| BPA COLE: | No. |
| THE COURT: | He could not have gotten in his car and just driven off, correct? |
| BPA COLE: | No, sir, he could not have. |

***

| | |
|---|---|
| Q (by Mr. Busse): | Agent Cole, I listened to your testimony.  Did you inform Mr. Jimenez-Robles that he was free to leave at any time? |
| A (by BPA Cole): | No. |
| Q: | And is it -- is that because he was not free to leave? |
| A: | That's correct. |

[2/4/15 Hrg. Tr.  pp. 22-23; *see also* pp. 29-31.]

Even if BPA Cole had not admitted that Defendant was not free to leave, the agents had handcuffed him and deprived him of access to his car and drove it to another location, where they maintained custody over the car while it was searched, a canine unit was summoned, and a canine sniff was conducted.  Furthermore, BPA Cole testified that there were anywhere from six to eight Task Force officers on the scene.  Though the testimony was that no weapons were drawn or displayed, in *United States v. Mitchell*,

20

161 F. App'x 537 (6th Cir. 2006), the presence of four officers persuaded the court that the defendants were "in custody" for purposes of *Miranda* because under those circumstances, "a reasonable person in [defendants'] position would not have felt at liberty to terminate the interrogation and leave. Although the police did not display their guns or threaten [defendants], the officers' stop of the [defendants'] car and the quantity of officers involved in the stop would certainly have been intimidating to a reasonable person." *Id.* at 540.

The second factor -- the purpose of the questioning -- also militates in favor of finding Defendant in custody. Defendant was not questioned by the officer who stopped him for the traffic offense. Instead, he was questioned by an immigration officer about his citizenship and immigration status. This questioning was entirely unrelated to Jimenez-Robles's driving or improper lane changes which gave rise to the traffic stop. Furthermore, BPA Cole who questioned Defendant testified he knew well-before commencing his questioning that Jimenez-Robles was likely in the country illegally, and his questioning was clearly conducted for the purpose of eliciting an incriminating response. A number of courts have held that asking a detainee questions unrelated to the stop is evidence of custodial interrogation. *See e.g.*,*United States v. Chavira*, 614 F.3d 127, 134 (5th Cir. 2010) (questioning detainee about the names, ages and number of her children at a fixed border crossing checkpoint was unrelated to routine citizenship checks and had no reasonable immigration-related purpose; hence, questioning was determined

to be custodial interrogation that entitled the detainee to *Miranda* warnings); *United States v. Schultz*, *supra*, 442 F. Supp. at 182 ("Once [the officer] went beyond the 'mold' of the traffic offense, *Miranda* was applicable."); *United States v. Urrieta, supra*, 2007 WL 208526 at ** 9-11.

As for the third factor -- the place of questioning -- plainly in and of itself  a public roadside is not overtly coercive.  However, here the number of officers at the stop location transformed that benign public place into a restrictive area of confinement, which also tips the scales in favor of Defendant.

The length of the questioning, which is the fourth factor to consider, is not clear as none of the reports nor BPA Cole's testimony indicated how long the questioning of Defendant lasted.  However, as noted above, Defendant's detention was significantly longer than that normally expected in an ordinary traffic stop and it ultimately resulted in Defendant's formal arrest.  In *Swanson* the Sixth Circuit considered the duration and whether the defendant was arrested at the conclusion of the interview in its analysis regarding custody under the "length of questioning" factor. Under those circumstances, this factor also weighs in favor of Defendant.

As for other indicia of custody, while it appears that Jimenez-Robles was for the most part not physically restrained during the detention -- except for the periods of time when he was handcuffed while his car was being moved to a safer location to conduct a search and, then again at the conclusion of the interview when he was about to be

22

transported by BPA Cole to the station -- Defendant was never told that he was *not* under arrest or that he was free to leave.  BPA Cole specifically testified that he never informed Defendant he was free to leave because, as Cole admitted, "he was not free to leave."  *See* Hrg. Tr. p. 23; *see also* pp. 22, 29-31.

Significantly, the Sixth Circuit and numerous other courts have repeatedly stated that a statement by a law enforcement officer that he was free to leave at any time is "an important factor in finding that the suspect was not in custody."  *United States v. Salvo*, 133 F.3d 943 (951) (6th Cir.), *cert. denied*, 523 U.S. 1122 (1998); *United States v. Swanson*, *supra*, 341 F.3d at 530 ("Most important to our analysis, though is that Swanson was explicitly told by [the officer] that he was not under arrest and that he did not have to speak with him if he did not choose to."); *Coomer v. Yukins*, 533 F.3d 477, 487 (6th Cir. 2008), *cert. denied*, 555 U.S. 1188 (2009) ("Third and perhaps most significantly, [Officer] Kucyk testified that he told Coomer several times that she was not under arrest and that the police would leave if asked."); *United States v. Czichray*, 378 F.3d 822, 826 (8th Cir. 2004), *cert. denied*, 544 U.S. 1060 (2005) ("[N]o governing precedent of the Supreme Court or court of appeals decision ... holds that a person was in custody after being clearly advised of his freedom to leave or terminate questioning."); *United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006), *cert. denied*, 549 U.S. 1182 (2007) ("[A]dvising a defendant that he is free to leave and is not in custody is a powerful factor in the mix, and generally will lead to the conclusion that the defendant is

23

*not* in custody.") (emphasis in original); *see also United States v. Sivils*, 960 F.2d 587, 598 (6th Cir.). *cert. denied*, 506 U.S. 843 (1992) (defendant not in custody where he was told before questioning he was not under arrest and would not be placed under arrest at the conclusion of the interview); *United States v. Macklin*, 900 F.2d 948, 951 (6th Cir.), *cert. denied*, 498 U.S. 840 (1990) (record would not support finding that defendants were in custody where they were told that they were not under arrest and were free to terminate questioning at any time).

Conversely, "the lack of a police advisement that the suspect is at liberty to decline to answer questions or free to leave is a significant indication of a custodial detention." *United States v. Griffin*, 7 F.3d 1512, 1518 (10th Cir. 1993); *United States v. Carter*, 884 F.2d 368 (8th Cir. 1989) (defendant in custody when questioned where he was not told he was free to leave or that he did not have to answer questions); *see also United States v. Franco-Martinez*, 2011 WL 4340857 (D. Minn. Aug. 30, 2011) (finding defendant in custody where there was no indication that he was ever told he did not have to answer the questions, that he was free to leave, or that he was not under arrest where law enforcement officer testified that defendant was, in fact, not free to leave and the intention was to continue his detention pending further investigation of his identity).

Considering the totality of the above-discussed circumstances, the Court finds that Defendant was in custody when he was questioned by Border Patrol Agent Cole at the traffic stop site regarding his citizenship and immigration status.  A reasonable person in

Defendant's position would not have felt free to leave.  Indeed, Agent Cole testified that Defendant was, in fact, not free to leave.  Accordingly, the Court concludes that BPA Cole's interrogation of Defendant Jimenez-Robles was in violation of his Fifth Amendment rights.  Therefore, the statements Jimenez-Robles made to Agent Cole regarding his immigration status must be suppressed.

CONCLUSION

For all of the reasons stated above in this Opinion and Order,

IT IS HEREBY ORDERED that Defendant's Motion to Suppress Statements **[Dkt. # 13]** is GRANTED.  Accordingly,

IT IS FURTHER ORDERED that the statements Defendant made to Border Patrol Agent Cole while detained at the site of the traffic stop will be SUPPRESSED.


s/Gerald E. Rosen
Chief Judge, United States District Court

Dated:  April 13, 2015

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on April 13, 2015, by electronic and/or ordinary mail.

s/Julie Owens
Case Manager, (313) 234-5135